THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES DAVIS, Defendant-Appellant.

Second District   No. 2—83—0026

Opinion filed August 21, 1984.

William R. Beu, of Rockford, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Andrea

Becker, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:

Defendant, James Davis, appeals from an order of the circuit court of Winnebago County revoking his conditional release under the Sexually Dangerous Persons Act (Ill. Rev. Stat. 1981, ch. 38, par. 105—10) and committing him to the Department of Corrections pursuant to the terms of his original commitment as a sexually dangerous person. Since we conclude that defendant was denied a fitness hearing erroneously prior to commencement of the revocation hearing, we reverse the order of the trial court and remand with the direction that defendant's fitness be determined.

Defendant was granted a conditional release on October 16, 1980. Thereafter, the State filed on January 15, 1982, a petition to revoke his conditional release. Psychiatric examinations of defendant were ordered and completed, but on August 20, 1982, the court granted the State's motion to deny defendant a fitness hearing. Defendant then tendered an offer of proof that Drs. Carl Hamann and J.G. Graybill would testify that defendant was unfit to stand trial.

At a hearing on the petition to vacate the conditional release held on October 28, 1982, the principal State witnesses were three young girls who testified defendant approached them on July 7, 1982. The girls were returning from a garage sale and were walking with traffic on Blackhawk Road in Cherry Valley. The car approached from behind them while they were walking, slowed and then briefly stopped. Two men were in the car, one of whom leaned out of the window closest to the girls. Elizabeth Hirth, an 11-year-old in the sixth grade, stated she was asked, "Do you want a ride?" by the man leaning out the passenger window of a green car. Upon hearing the question, she ran away from the car. On the day of the hearing, Elizabeth did not recognize defendant in the courtroom.

Stephanie Putzstuck, an 8½-year-old fourth-grader, did identify defendant at the hearing and stated defendant reached out of the car and touched, but did not grab, her arm. Rebecca Hirth, 9½ years old and a fourth-grader, also testified she and Stephanie were touched by defendant. Both Putzstuck and Rebecca testified that after the incident they ran to the Hirth residence and that the car turned around in the Hirth driveway and drove away in the opposite direction.

Betty Hirth, the grandmother with whom the Hirth grandchildren lived, testified she walked out of her garage between 5 and 6

p.m. on July 7, 1982, heard talking and then a scream from down the road. A green Buick LaSabre then turned around in her driveway with one man hanging out the window. Her daughter followed the car and obtained its license plate number. In about one-half hour, the sheriff's deputy phoned the Hirths and requested them to come to the Kishwaukee Forest Preserve. There, Betty Hirth identified defendant as one of the men in the car, although she thought defendant was the driver of the car.

Winnebago County sheriff's deputy David Fiduccia went to the forest preserve on July 7, 1982, pursuant to a radio transmission, and in conjunction with Cherry Valley police department officers located a Chevrolet automobile. He found defendant sitting on a picnic table 10 to 15 feet from the river and found defendant's brother lying on his back naked along the shore. The two were apparently talking. Fiduccia asked defendant to have his brother come out of the river. Defendant then "staggered" toward the river and put one foot in the water before police officers grabbed him. Fiduccia testified Becky Hirth and Stephanie Putzstuck identified the two men at the forest preserve. Defendant testified he was at the forest preserve on July 7, 1982, but denied talking to or seeing any girls. He did admit traveling in a car on Blackhawk Road.

While defendant asserts the trial court erred in denying him a fitness hearing, the State contends this court need not decide that issue because the record discloses no *bona fide* doubt about defendant's fitness. Fitness for trial requires that a defendant have the ability to understand the nature and purpose of the proceedings and to assist in his own defense. (*People v. Murphy* (1978), 72 Ill. 2d 421.) The law presumes a defendant to be fit (Ill. Rev. Stat. 1981, ch. 38, par. 104—10), and the determination as to whether a *bona fide* doubt has been raised rests largely within the trial court's discretion. (*People v. Murphy* (1978), 72 Ill. 2d 421.) A defendant can be fit for trial although his mind may be otherwise unsound. (*People v. Lang* (1979), 76 Ill. 2d 311; *People v. Murphy* (1978), 72 Ill. 2d 421.) The mere fact that a defendant has suffered some mental disturbance or in the past has required psychiatric treatment does not necessarily raise a *bona fide* doubt as to his fitness. (*People v. Green* (1983), 116 Ill. App. 3d 815, 452 N.E.2d 767.) The above rule is especially true when a defendant manifests to the court and to his counsel a coherence and lucidity inconsistent with a claim of unfitness. *People v. Green* (1983), 116 Ill. App. 3d 815, 452 N.E.2d 767.

The State cites as the best evidence of defendant's fitness his direct and cross-examination testimony concerning his actions on the

day of the incident. His trial attorney stated that "my client does want to tell the court that he did not do that." On direct examination, defendant stated he had heard all the prior testimony in the revocation proceeding and that he remembered "very clearly" July 7, 1982, the date of the incident. He remembered he had gone to the Kishwaukee Forest Preserve and on cross-examination admitted he drove down Blackhawk Road to the forest preserve. Defendant testified his brother was driving the car and denied seeing or speaking with any girls or children. At the forest preserve, defendant said his brother took his clothes off and put the clothes on the ground. Defendant denied running from the police officer at the forest preserve, but instead stated he went to the river to help someone get his inner tube. While at some points during defendant's testimony he was not completely responsive to the questions asked, he did demonstrate awareness of the day in question and recalled his own actions and the actions of others.

Another factor suggesting defendant's fitness is the absence of any statements by his counsel in the record that defendant was unable to cooperate in his defense. Statements by counsel of his client's uncooperativeness are indicative of unfitness. (*People v. Johnson* (1984), 121 Ill. App. 3d 859, 460 N.E.2d 336.) In contrast to the absence of uncooperativeness here, the court in *Johnson* found a *bona fide* doubt existed based in part upon the fact that counsel alerted the court that the defendant would not cooperate with him, that the defendant had not spoken to him for a long time, and that defendant "only smiled when counsel tried to explain his rights and other aspects of the case to him." (121 Ill. App. 3d 859, 861, 460 N.E.2d 336, 338.) Even if defendant's counsel did assert defendant's uncooperativeness, that claim would be somewhat belied by defendant's subsequent decision to testify in the instant case.

A defendant's demeanor at trial also is relevant to a determination of his fitness. (*People v. Johnson* (1984), 121 Ill. App. 3d 859, 460 N.E.2d 336.) The only comment of the trial judge regarding defendant's fitness is his statement that defendant was "retarded" or "borderline retarded." The trial judge also made special efforts to direct defendant toward the proper exit after court proceedings terminated and admonished defendant not to speak in court without consulting first with his attorney. These facts could be construed to imply that the trial judge believed defendant was not able to understand the nature of the court proceedings without at least some aid.

The primary evidence of defendant's unfitness was from two psychiatrists who were ordered by the court to examine defendant to

ascertain whether he was fit to stand trial. Graybill stated he examined defendant on July 22, 1982. Defendant then knew that he had been confined to the Menard psychiatric section for 15 years and had been given a conditional discharge. Graybill decided defendant was not oriented as to time, was distractable and was confused regarding the offense preceding his confinement, did not know why he was in jail or the name of his attorney and had "absolutely no knowledge of the court process in spite of the fact that he had been to court previously." Based upon these observations, Graybill concluded defendant was unfit to stand trial. A similar conclusion was reached by Hamann, who stated that defendant was distractable, was not oriented to the correct time and date, and took a long time to recall events and to answer questions. Hamann also stated defendant "could not explain the various functions in the court process despite his previous court appearances." Therefore, Hamann concluded "with reservation" that defendant was not fit to stand trial.

Also indicative of defendant's unfitness is his prior treatment for medical disability. (See *People v. Johnson* (1984), 121 Ill. App. 3d 859, 460 N.E.2d 336.) However, defendant has a long history of treatment for his mental condition; this factor is less suggestive of defendant's fitness than are his demeanor at trial and his cooperativeness with counsel. Those two factors are indicative of defendant's fitness at the time of trial, while defendant's history of mental treatment is only truly indicative of his mental condition in the past.

■ Considering the above factors, we conclude the record indicates that a *bona fide* doubt was raised about defendant's fitness. The findings of the two psychiatrists were that defendant was unfit for trial. The State's citation to *People v. Thomas* (1969), 43 Ill. 2d 328, for the statement that psychiatric reports are not conclusive even as to the existence of a *bona fide* doubt is inapposite. There, the supreme court held that the defendant was erroneously denied a fitness hearing, even though the psychiatric report indicated he was fit to stand trial. Since the psychiatric reports here concluded defendant was unfit for trial, *Thomas* is distinguishable and thus, we address the remaining issues raised by defendant.

Defendant contends that the incident did not constitute a violation of any of the terms of his conditional release. The substantive provisions governing the conditional release of an individual following commitment as a sexually dangerous person are codified within the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1981, ch. 38, par. 105—10.) Upon granting a conditional release, "the court may enter an order permitting such person to go at large subject to

such conditions and such supervision by the Director [of the Illinois Department of Corrections] as in the opinion of the court will adequately protect the public." (Ill. Rev. Stat. 1981, ch. 38, par. 105—10.) Additionally, that section states that "[i]n the event the person violates any of the conditions of said order, the court shall revoke such conditional release and re-commit the person pursuant to Section 5—6—4 of the Unified Code of Corrections under the terms of the original commitment." (Ill. Rev. Stat. 1981, ch. 38, par. 105—10.) The terms listed in defendant's conditional release are: (1) defendant must live with his sister; (2) must stay there between sundown and sunrise every day; (3) must participate in all programs of a local mental health center; (4) must report to a qualified parole counselor no fewer than three times each month; (5) must take any medication required by the Director or the mental health center; and (6) must comply with any additional conditions set up by the Director. Neither party has cited any conditions imposed by the Director in addition to those contained in defendant's conditional release order.

In its petition, the State charged that defendant was guilty of disorderly conduct by offering a ride to and touching the girls, that defendant and his brother were later found in the forest preserve with his brother naked in the river, and that defendant ran into the river after being approached by police officers. Such conduct, the petition stated, "constitutes a material and direct violation of the Court's order with respect to the conditional release of the defendant."

■ The State acknowledges that defendant's conduct did not violate a specific condition of the release order, but challenges defendant's conclusion that therefore revocation was improper. Relying upon this court's decision in *People v. Patch* (1972), 9 Ill. App. 3d 134, 293 N.E.2d 661, the State argues a defendant's conduct need not violate a specific condition to warrant revocation. In *Patch*, a defendant who was released under the Sexually Dangerous Persons Act was charged with a deviate sexual assault. Rejecting the defendant's argument that such conduct did not violate the specific conditions of his release order, the *Patch* court stated:

> "We do not agree, however, that a conditional release pursuant to Section 9 can only be revoked for a violation of a specific condition expressed in the order. It is implicit, in any reasonable interpretation of the Act, that a conditional release could be revoked if the person adjudged sexually dangerous committed an additional sex offense during the period of his release." (9 Ill. App. 3d 134, 137, 293 N.E.2d 661, 664.)

While the defendant in *Patch* was charged with conduct more opprobrious than the conduct attributed to defendant here, the fact that the defendant's conduct constituted a ground for revocation despite not violating a specific condition in his order makes *Patch* determinative of the case at bar. Adoption of defendant's position would place too high a burden on the court to list every possible action which would justify recommitment. We agree with the trial court's statement that the conduct involved here is clearly violative of the spirit if not the letter of the release order.

■ Because we conclude defendant's conduct violated his release order, defendant's argument that the trial court lacked jurisdiction to revoke his release because no term of the order was violated is without merit. Even if considered, defendant's argument is unpersuasive. Contrary to his contention, the committing court has continuing jurisdiction to consider petitions by the State concerning a violation of the release order. Under defendant's construction of the court's jurisdiction, any conduct not violative of a specific condition would not trigger the court's jurisdiction, and thus, any action taken by the court under those circumstances would be void. Such a construction of the statute would be too restrictive of the court's power and would insulate released persons from recommitment unless their conduct violated the specific wording of the release order. Finally, contrary to defendant's assertion, the record indicates that defendant's involvement in the incident was proved by a preponderance of the evidence.

The last issue presented by this appeal is whether the trial court erred in denying defendant a fitness hearing prior to conducting the revocation proceeding. We analyze this question on the basis of whether the denial of a fitness hearing violated defendant's due process rights under the Illinois Constitution (Ill. Const. 1970, art. I, sec. 2) and the Federal Constitution (U.S. Const., amend. XIV, sec. 1). Both parties agree that the issue has not been decided by an Illinois court. Defendant emphasizes that section 5—6—4(c), which governs revocation proceedings, provides that the evidence on the revocation issue "shall be presented in open court with the right of confrontation, cross-examination, and representation by counsel." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—4(c).) Since the intelligent exercise of those rights depends upon the mental capacity of the defendant, defendant contends, a fitness determination is necessary to ensure the protection of a defendant's rights.

The State rejects the conclusion that a fitness hearing was required by the facts here. Nowhere in the procedures provided for in

the Sexually Dangerous Persons Act, the State argues, is a fitness hearing mentioned. Rather, fitness hearings are provided for in article 104 of the Code of Criminal Procedure of 1963, titled "Fitness for Trial, To Plead or to be Sentenced," which suggests a fitness hearing is limited to trials. The State notes that a proceeding under the Sexually Dangerous Persons Act is not a trial or a criminal proceeding, but rather is civil in nature. (*People v. Studdard* (1972), 51 Ill. 2d 190.) While the reasonable-doubt standard of proof applies to sexually dangerous persons proceedings, other elements of the criminal process, such as admonitions regarding the right to a jury trial, a right to appeal and the consequences of a guilty plea are not constitutionally required. *People v. Pembrock* (1974), 23 Ill. App. 3d 991, 320 N.E.2d 470, *aff'd* (1976), 62 Ill. 2d 317.

The State argues the reasoning employed by the *Pembrock* court supports the trial court's action here. While noting that both proceedings under the Sexually Dangerous Persons Act and criminal proceedings may result in a loss of liberty, the *Pembrock* court differentiated them on the basis that unlike criminal proceedings, commitments contain no inference of moral blameworthiness and are not intended as punishment. The supreme court affirmed the appellate court in *Pembrock* on the ground that the reasonable doubt standard should be applied to sexually dangerous persons proceedings. *People v. Pembrock* (1976), 62 Ill. 2d 317.

In another case pertinent to the facts here, the supreme court in *People v. Olmstead* (1965), 32 Ill. 2d 306, rejected the defendant's argument that a person accused under the Sexually Dangerous Persons Act was mentally incompetent to stand trial and to waive his right to a jury trial. Defendant argues the case supports his position here on appeal because rather than holding that fitness hearings were inapplicable to proceedings under the Sexually Dangerous Persons Act, the court instead reviewed the record and found evidence that the defendant had the mental capacity to stand trial and to waive his right to a jury trial.

*Olmstead* does provide some support for defendant's position. The defendant in *Olmstead* contended the fact that he was charged under the Sexually Dangerous Persons Act necessarily rendered him incompetent to waive certain rights. By not concluding the question of defendant's fitness was irrelevant to those proceedings, the supreme court implicitly stated that defendant's fitness should be ascertained. However, *Olmstead* involved an original commitment proceeding, while here defendant's argument pertains to a revocation of a conditional release. The natures of the two proceedings are differ-

ent. For example, in the original commitment proceeding, a defendant must be proved guilty beyond a reasonable doubt, while here the State need only prove the violation of a conditional release by a preponderance of the evidence. Application of the preponderance standard suggests revocation proceedings are more in the nature of a civil commitment. In fact, the trial court specifically rejected defendant's request for a fitness hearing on the basis that the revocation proceeding was analogous to an involuntary civil commitment which does not require a fitness determination. Therefore, we find *Olmstead* not dispositive of the case at bar.

This issue can be analogized to the rights which a parolee or a probationer enjoys prior to the revocation of his parole or probation. The Uniform Code of Corrections consistently refers to probation and conditional release as similar sentencing alternatives. For example, section 5—1—18 of the Uniform Code of Corrections defines probation using the term conditional release: " 'Probation' means a sentence or disposition of conditional or revocable release under the supervision of a probation officer." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—1—18.) Section 5—5—3, which concerns dispositions, lists both periods of probation and terms of conditional discharge as appropriate dispositions for certain felonies and misdemeanors. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.) Furthermore, article 6 of the Uniform Code of Corrections is titled "Sentences of Probation And Conditional Discharge" and sections 5—6—1, 5—6—2, and 5—6—3 use probation and conditional discharge almost interchangeably. Also, section 5—6—4 concerning violations, modifications and revocations of probation and conditional discharges provides that defendants free on either method of release possess the rights of confrontation, cross-examination and representation by counsel. Finally, the State under section 5—6—4(c) must prove violations of probation and conditional discharge orders alike by a preponderance of the evidence. Based upon the statutory similarities between probation and conditional discharges, and because of the absence of case law interpreting conditional discharge revocations, we analyze cases interpreting revocation of probation proceedings as directly analogous to the conditional discharge revocation presented in the case at bar. We also examine parole revocation cases, for a parolee enjoys the same due process rights at a parole revocation proceeding as he does at a probation revocation proceeding. See *People v. Isringhaus* (1976), 38 Ill. App. 3d 535, 347 N.E.2d 834.

The United States Supreme Court discussed the rights of parolees in parole revocation proceedings in *Morrissey v. Brewer* (1972),

408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593. There, the Supreme Court held that a parolee is entitled to certain rights prior to his parole revocation:

"They include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and the reasons for revoking parole." (408 U.S. 471, 489, 33 L. Ed. 2d 484, 499, 99 S. Ct. 2593, 2604.)

While stating a revocation of parole was not part of the criminal prosecution, the court did conclude that a parolee's liberty is similar to that enjoyed by the populace at large and therefore is deserving of fourteenth amendment protection.

Subsequent to *Morrissey*, the Supreme Court in *Gagnon v. Scarpelli* (1973), 411 U.S. 778, 36 L. Ed. 2d 656, 93 S. Ct. 1756, held that the probationer was entitled to both a preliminary hearing to determine whether there was probable cause to believe that he had violated his probation and a final hearing prior to the ultimate decision whether his probation should be revoked. The *Gagnon* court also concluded a State was not under a constitutional duty to provide counsel for indigents in all cases and that the need for counsel should be determined on a case-by-case basis. Consistent with the *Morrissey* and *Gagnon* courts' recognition that the full panoply of rights due a defendant in a criminal proceeding does not apply to parole and probation revocations, Illinois courts have held that Supreme Court Rule 402 admonitions (*People v. Beard* (1974), 59 Ill. 2d 220) and the discovery rules referred to in Supreme Court Rule 411 (*People v. DeWitt* (1978), 66 Ill. App. 3d 146, 383 N.E.2d 694, *aff'd* (1979), 78 Ill. 2d 82) are not applicable to probation revocation proceedings. A defendant is entitled, however, as part of minimal due process to a meaningful opportunity to be heard (*People v. Lee* (1980), 88 Ill. App. 3d 396, 410 N.E.2d 646), and to a statutory right to appointed counsel. *People v. Baker* (1981), 101 Ill. App. 3d 1114, 428 N.E.2d 1188, *aff'd on other grounds* (1983), 94 Ill. 2d 129.

Our research has uncovered only one Illinois decision in which a defendant's fitness was considered prior to a probation revocation

proceeding. In *People v. Matschke* (1980), 83 Ill. App. 3d 1000, 1003, 404 N.E.2d 1047, the defendant filed on the day preceding the revocation hearing a motion for a competency hearing accompanied by two affidavits "each reciting an examination at an unspecified time and an opinion that defendant was unable to understand the state of the charges and was unable to assist counsel." (83 Ill. App. 3d 1000, 1003, 404 N.E.2d 1047, 1049.) The trial court found no facts presented by the affidavits which raised a *bona fide* doubt about defendant's fitness, and the appellate court concluded the trial court in so ruling did not abuse its discretion. At the sentencing hearing, the defendant again presented a motion for a competency hearing and the court heard testimony from the defendant's psychiatrist as well as from two psychiatrists appointed by the trial court. In examining the trial court's determination that the defendant was competent to be sentenced, the reviewing court ruled the lower court's decision was not against the manifest weight of the evidence. *Matschke* did not expressly hold that a defendant is entitled to a fitness evaluation prior to a revocation-of-probation proceeding. Nevertheless, the court's consideration of the defendant's competency motions prior to the revocation and sentencing hearings is persuasive support for the existence of defendant's asserted right to a fitness hearing in the instant case and is in conflict with the trial court's conclusion here that fitness determinations are inapplicable to proceedings for revocations of conditional discharges.

Several other State courts have considered the question of a defendant's competence in relation to a probation or parole revocation proceeding. In *Pierce v. Department of Social & Health Services* (1982), 97 Wash. 2d 552, 646 P.2d 1382, the Supreme Court of Washington held that constitutional due process requires a parole board or hearing officer to order a competency hearing prior to the final revocation proceeding. Such an evaluation is necessary, the *Pierce* court stated, "whenever a parolee's competence is called into question at a revocation proceeding." (97 Wash. 2d 552, 560, 646 P.2d 1382, 1386-87.) In contrast to its conclusion that due process requires a fitness determination at the dispositional phase of the revocation proceeding, however, the *Pierce* court stated the defendant is not entitled to a competency hearing at the earlier portion of the revocation proceeding at which the defendant's alleged probation violation is considered.

The court in *Hayes v. State* (Fla. App. 1977), 343 So. 2d 672, likewise concluded a defendant is entitled to a competency hearing during a probation revocation proceeding. Finding a probation revo-

cation hearing similar to a criminal proceeding in that "the defendant's liberty is at stake, and his ability to assist in his own defense may be determinative of the outcome of the revocation hearing" (343 So. 2d 672, 673), the *Hayes* court reversed the order of the trial court who, like here, "was under the impression that there was no authority for him to conduct a competency hearing in a probation revocation proceeding." *Hayes v. State* (Fla. App. 1977), 343 So. 2d 672; see also *Commonwealth v. Edward* (1982), 303 Pa. Super. 454, 450 A.2d 15 (reviewing court remanded cause for reconsideration of whether defendant was competent to participate in a revocation hearing); *Commonwealth v. Megella* (1979), 268 Pa. Super. 316, 408 A.2d 483 (revocation of probation and subsequent resentencing of a defendant who is incompetent is a violation of due process).

Apart from decisions involving probation revocation proceedings, this court's recent decision concerning the Dangerous Drug Abuse Act (Ill. Rev. Stat. 1981, ch. 91½, par. 120.1 *et seq.*) (the Act) also supports granting a fitness hearing to defendant in the instant case. In *People v. Beckler* (1984), 121 Ill. App. 3d 436, 459 N.E.2d 672, the defendant pleaded guilty to burglary and theft charges, and was placed under the supervision of a licensed treatment program pursuant to the Act. When the treatment center informed the court that the defendant was unacceptable for the program, the court without a hearing terminated the supervision and entered judgment on the earlier guilty pleas. This court examined section 9 of the Act and determined that the statute created a liberty interest incapable of extinction absent a proceeding held with procedural due process safeguards. In reaching this conclusion, this court likened the defendant's status to that of a probationer:

> "Defendant's status as a person under the supervision of a licensed program is akin to that of a probationer. Thus, we believe that the individual subject to termination should be accorded the following rights: (1) written notice of the reasons the individual cannot be further treated; (2) an opportunity to be heard and to present witnesses; (3) disclosure to him of the evidence against him; and (4) the right to confront and cross-examine adverse witnesses." 121 Ill. App. 3d 436, 441, 459 N.E.2d 672, 675-76.

We similarly believe a defendant has a constitutional liberty interest in his conditional discharge which cannot be extinguished absent due process. "Where a State statute creates a right and specifies that that right may be forfeited only upon the misconduct of an individual, then that individual has a liberty interest which requires

that procedural due process be accorded the individual in the determination whether the misconduct has occurred." 121 Ill. App. 3d 436, 439, 459 N.E.2d 672, 674.

In considering what process is due a defendant on conditional release, we hold that a defendant is entitled to a fitness hearing prior to the revocation proceeding if his competency is questioned by the court or the parties. Section 5—6—4(c) specifically provides that in determining whether a defendant has violated the conditional release order, "[t]he evidence shall be presented in open court with the right of confrontation, cross-examination, and representation by counsel." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—4(c).) The intelligent exercise of these rights is prevented if a defendant is unfit. In light of this fact, we find unpersuasive the distinction drawn by the court in *Pierce v. State Department of Social & Health Services* (1982), 97 Wash. 2d 552, 646 P.2d 1382, that a parolee is entitled to a competency determination at the dispositional phase of the revocation proceeding, but not earlier when the court determines whether the parolee violated his order. (*Cf. People v. Burnside* (1977), 52 Ill. App. 3d 524, 367 N.E.2d 733 (trial court erred in not holding a competency hearing prior to trial even though the defendant's fitness was determined prior to sentencing).) The *Pierce* court itself recognized the danger inherent in its holding, acknowledging "the possibility that the incompetent parolee might possess information which would prove him innocent but which he is unable to communicate to his attorney ***." (97 Wash. 2d 552, 559, 646 P.2d 1382, 1386.) This danger is especially significant where, as here, the State has granted a defendant a statutory right to counsel in probation and conditional discharge revocation proceedings. See Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—4(c).

What prompted the *Pierce* court to deny the defendant a competency hearing at the initial stage of the revocation proceeding was its concern that the parole board would have no means of exercising its control over the parolee until he regained fitness, thereby allowing the parolee to remain free as a danger to society because of his unfitness. Such a situation would not occur under the Illinois statutory scheme. Upon the filing of a conditional discharge revocation petition, a defendant would file a motion with the court for a fitness hearing. If after the hearing the trial court determines that the defendant is in fact unfit, and if the defendant's disability is mental, the court may order him placed for treatment in the custody of the Department of Mental Health and Developmental Disabilities or any other appropriate public or private agency. (Ill. Rev. Stat. 1981, ch.

38, par. 104—17(b).) The person supervising the defendant's treatment must file with the trial court within 30 days of the entry of the order to undergo treatment a report indicating his opinion whether the defendant has a substantial probability of obtaining fitness within one year from the unfitness determination. (Ill. Rev. Stat. 1981, ch. 38, par. 104—17(e).) If no substantial probability exists, the defendant can demand a discharge hearing conducted by the court without a jury. (Ill. Rev. Stat. 1981, ch. 38, par. 104—25.) At the hearing, the State and the defendant may introduce evidence relevant to the question of the defendant's guilt of the crime charged. Absent a request by the defendant for a discharge hearing and upon a finding by the trial court that there is not a substantial probability that the defendant will be fit within one year, the State has three options under section 104—23. (Ill. Rev. Stat. 1981, ch. 38, par. 104—23.) One of these options is to request the court to remand the cause to the Department of Mental Health and Developmental Disabilities for a hearing, after which, if the defendant is committed, the trial court dismisses the charges with leave to reinstate them.

Based upon the foregoing procedures which govern a defendant once he is determined to be unfit, an unfit defendant would not be allowed to remain free as a danger to society. Rather, that defendant generally would receive treatment until such time as he was fit to proceed with the revocation proceeding. Since a defendant under the Illinois procedures could not evade the revocation process merely by asserting unfitness, we find unpersuasive the *Pierce* court's rationale for denying a parolee a competency determination prior to the commencement of the revocation process. More importantly, we conclude the availability of a fitness hearing prior to revocation of a defendant's conditional discharge is essential to preserve a defendant's statutory rights of representation, cross-examination, and confrontation.

Because the trial court in the case at bar erroneously concluded that fitness hearings were inapplicable to conditional release revocation proceedings, we reverse the order of the trial court and remand this cause for a determination of defendant's fitness.

Reversed and remanded.

SEIDENFELD, P.J., and HOPF, J., concur.